Receipt number AUSFCC-7402034

## UNITED STATES COURT OF FEDERAL CLAIMS

ROBERT S. CARLBORG )
P.O. Box 436 )
San Luis Rey, CA 92068, )
                 )
           *Plaintiff,* )
                 )
        v. )
                 )
THE UNITED STATES OF AMERICA )
                 )
           *Defendant.* )

Civil Action No.: <u>21-1994 C</u>

### COMPLAINT FOR BACK PAY AND
### COLLATERAL INJUCTIVE RELIEF

Plaintiff, Robert Carlborg, for his Complaint for back-pay and collateral injunctive relief against defendant, the United States of America, alleges as follows:

### JURISDICTION AND VENUE

1.    This action is one for back-military pay pursuant to the Tucker Act, as plaintiff failed to receive relief from the Secretary of the Navy acting through the Board for Correction of Naval Records ("BCNR").   Plaintiff herein asserts he was wrongfully discharged from active duty and, accordingly, the money mandating statute providing Tucker Act jurisdiction is the Military Pay Act, 37 U.S.C. § 204(a).  This Court has jurisdiction and venue for Tucker Act claims in excess of $10,000.

### PARTIES

2.    Plaintiff is a former Marine Corps officer who was involuntarily discharged from the Marine Corps on October 9, 2015.  Prior to his involuntary discharge, plaintiff served on active duty in the

Marine Corps for 19 years, 11 months and 17 days. Defendant, pursuant to the provisions of the Tucker Act, 28 U.S.C. § 1491(a), is the United States of America.

## STATEMENT OF FACTS RELEVANT TO PLAINTIFF'S CLAIMS

3.    On May 16, 2014 and May 30, 2014, plaintiff engaged in consensual sexual relations with a married civilian female in Jacksonville, NC.  The woman's husband found explicit images of his wife on their shared computer and confronted his wife regarding the images.  The wife admitted to her husband that she committed adultery with plaintiff.

4.    The husband examined plaintiff's social media accounts in order to identify him and, once identified, the husband notified the Naval Criminal Investigative Service ("NCIS") of plaintiff's conduct with his wife.  NCIS then notified plaintiff's command inasmuch as NCIS is prohibited from investigating consensual sexual relations.

5.    On August 21, 2014, a command investigation examined the allegations against plaintiff. The investigation substantiated allegations that plaintiff committed adultery with the wife and verified that plaintiff had engaged in misconduct in his use of social media.

6.    The investigation documented two dating websites through which plaintiff sought consensual sexual relations with women other than his wife and displayed photos of plaintiff engaged in sexual activities with women other than his wife.  Some of the images displayed on plaintiff's social media that were not in any way suggestive included plaintiff wearing his Marine Corps camouflage utility uniform, from which a viewer might ascertain that the subject was or had been a Marine.

7.    On December 9, 2014, plaintiff's command preferred charges against him for violations of Article 133 (conduct unbecoming an officer and a gentleman) and Article 134 (adultery).  On January 2, 2015, plaintiff submitted a pretrial agreement ("PTA") in which he offered to accept non-judicial punishment ("NJP") for all charges.

8.    On January 12, 2015, the Commanding General ("CG"), II Marine Expeditionary Force ("II MEF"), accepted the pretrial agreement and notified plaintiff of his intent to impose NJP for violations of Article 133 (conducting unbecoming an officer and a gentleman) and Article 134 (adultery).  As part of the PTA, plaintiff expressly waived the NJP protection of the 2-year statute of limitations.  The Convening Authority agreed to dismiss the court-martial charges with prejudice upon imposition of NJP.

9.    On January 13, 2015, plaintiff acknowledged receipt of the notification and accepted NJP. The NJP hearing was held on February 5, 2015.

10.    In accordance with the requirements of the PTA, plaintiff pleaded guilty to, and was found guilty of, all charges and specifications.  The CG, II MEF, imposed as punishment a punitive letter of reprimand and forfeitures of $3,715.05 pay per month for a period of two months.  Neither at, nor subsequent to the NJP, did the Convening Authority execute any document dismissing the court-martial charges, as was required by the PTA and the court martial statute of limitations had not run on those charges at the time plaintiff was discharged.

11.    On February 9, 2015, the CG, II MEF, issued plaintiff a punitive letter of reprimand.  That same day, plaintiff acknowledged receipt of the letter of reprimand, indicated his desire to appeal, and indicated his desire to submit a statement in response.

12.    On February 16, 2015, plaintiff submitted a response to the Letter of Reprimand in which he acknowledged responsibility for his conduct and expressed his sincere desire to continue serving in the Marine Corps.  On February17, 2015, plaintiff decided not to appeal the punishment.

13.    On February 19, 2015, the CG, II MEF, prepared a Report of NJP.  In the Report, the CG, II MEF, recommended that plaintiff be required to show cause at a Board of Inquiry ("BOI").  On February 19, 2015, plaintiff acknowledged receipt of the Report and submitted a statement in response in which he again acknowledged responsibility and accountability for his conduct and again expressed his sincere desire to continue serving in the Marine Corps and to not be required to show cause.

14.    On March 4, 2015, as required by regulation upon imposition of NJP, plaintiff's Reporting Senior ("RS") submitted a "Directed by the Commandant of the Marine Corps ("DC") fitness report for the period June 1, 2014 to February 5, 2015.  The report was adverse because it was based on disciplinary action as well as other markings considered adverse by regulation.

15.    On March 12, 2015, plaintiff signed the report acknowledging its adverse nature, and attached a statement.  In his statement, plaintiff "admit[ted] a degradation in his performance" during the reporting period, but referenced substantial "mitigating" factors, including an investigation into "unsubstantiated" offenses; "physical threats" made against his family; and previously untreated mental health issues, including alcoholism and Post-Traumatic Stress Disorder ("PTSD"), for which plaintiff had not previously received treatment.

16.    On April 7, 2015, plaintiff's Reviewing Officer ("RO") included his comments and "unsatisfactory" comparative assessment on plaintiff's fitness report.  The RO stated that Petitioner's "performance of duty was unsatisfactory."

17.    In addressing the allegedly mitigating factors raised by plaintiff in his rebuttal to the RS's comments, the RO asserted that plaintiff "did not seek help for his mental health and alcohol issues until after he was under investigation" and "[a] determination of PTSD has not been reached."  The RO did not address plaintiff's contentions that his untreated alcoholism contributed to his conduct and performance, the purported threats against his family, and that an NCIS investigation that had been closed without further action against plaintiff for unalleged unsubstantiated offenses.

18.    On March 12, 2015, the Commander, Marine Forces Command ("COMMARFORCOM"), notified plaintiff that he would be required to show cause at a BOI for substandard performance of duty and misconduct or moral or professional dereliction.  The asserted bases for the BOI were plaintiff's (a) failure to demonstrate acceptable qualities of leadership required of an officer of his grade, (b) failure to properly discharge duties expected of officers of his grade and experience, (c) commission of a military offense punishable by confinement of six months or more and any other misconduct which would require specific intent for conviction, and (d) sexual perversion.

19.    On January 5, 2015, plaintiff was evaluated by a Navy physician, who was also the Group Surgeon, Headquarters, II Marine Expeditionary Force.  Upon his admission, he believed his mental health to be deteriorating.  Dr. A.L.O. concluded that plaintiff "is now noted to have symptoms consistent with Major Depressive Disorder, Alcoholism and PTSD as defined  . . . [in the Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition (DSM-IV-TR)]."

20.    Dr. A.L.O., in a memorandum dated January 5, 2015, recommended plaintiff voluntarily seeks "medical care from a mental health provider."

21.   On January 22, 2015 and February 16, 2015, plaintiff sought help from a mental health provider and was examined by a civilian clinical psychologist in Norfolk, VA.  The civilian psychologist diagnosed plaintiff with PTSD, among other disorders.

22.   The civilian clinical psychologist opined that Petitioner's diagnoses were a factor in his conduct that led to the charges.

23.   On February 20, 2015, LT A.L.O., MC, USN entered a medical record entry in Petitioner's official medical record stating that plaintiff is "not currently considered psychologically fit for duty."   Pursuant to Secretary of the Navy Instruction ("SECNAVINST") 1850.4E, upon a determination that he was not fit for duty, plaintiff should have been referred for evaluation to the Department of the Navy Disability Evaluation System ("DES"), as required by regulation.

24.   On June 17, 2015, plaintiff was seen at the Deployment Wellness Clinic at Camp Lejeune, North Carolina by Licensed Clinical Social Worker ("LCSW") TW, on referral from the base Mental Health office at Camp Lejeune, NC.  Ms. TW acknowledged that plaintiff had been diagnosed with PTSD by a civilian psychologist in January 2015, and conducted an intake evaluation.

25.   At the conclusion of the examination/evaluation, Ms. TW provided a "working diagnosis" that plaintiff currently met the criteria for PTSD and Unspecified Depressive Disorder "according to information provided by patient, a review of patient's AHLTA [medical] records and this clinician's observations."

26.    Ms. TW concluded that results of plaintiff's examination should remain confidential from his command pursuant to Department of Defense Instruction ("DoDI") 6490.08 dated August 17, 2011.

27.    LCSW TW met with plaintiff for treatment next on July 7, 2015 and thereafter on July 27, 2015, August 11, 2015, August 26, 2015, September 14, 2015 and October 5, 2015.

28.    In each case, Ms. TW reported plaintiff's then-current working diagnosis was PTSD and Unspecified Depressive Disorder.  Following each clinical interaction, LCSW TW concluded that patient confidentiality should be protected pursuant to DoDI 6490.08, so no report of her clinical evaluation was provided to plaintiff's command.

29.     At no time did LCSW TW conclude that plaintiff was **not** suffering from PTSD and she made no findings inconsistent with that diagnosis in any of plaintiff's medical records.

30.    On April 26, 2017, plaintiff was notified that his evaluation by the Veteran's Administration ("VA") for disability based on his medical record and diagnosis of PTSD and the VA concluded that plaintiff was entitled to a rating of 70% disability for PTSD.

31.    The VA concluded:  "service connection for posttraumatic stress disorder has been established *as directly related to military service*." (emphasis supplied).  The VA further concluded:  The overall evidentiary record shows the severity of your disability most closely approximates the criteria for 70 percent disability evaluation."

32.    In reaching that conclusion the VA determined, based on plaintiff's service and medical records that plaintiff was:

> imbedded in an Iraqi Brigade and participated in combat with that unit.  You lived with the Iraqi Brigade, which meant absolutely no time to relax your guard as the Iraqi forces are known to contain hostiles to our American forces.

33.   The VA rating system uses the Veteran's Administration Standards for Rating Disability ("VASRD"), which is the same source, using the very same standards, that the Navy Physical Evaluation Board ("PEB") is required to utilize, pursuant to SECNAVINST 1850.4, ¶¶ 3802-3803, when considering a military member for disability.

34.   On March 12, 2015, plaintiff acknowledged receipt of the notification of BOI.  That same day, March 12, 2015, plaintiff submitted a request for retirement in lieu of further administrative processing based upon his approaching twenty years of active-duty service or alternatively, pursuant to the Fiscal Year 2015 Temporary Early Retirement Authority ("TERA") Program.

35.   In his request, plaintiff acknowledged responsibility for his conduct and acknowledged that he had been punished for it.  Plaintiff acknowledged that he could be retired in the grade in which he last served honorably for six or more months, as determined by the Secretary of the Navy, and requested to retire in his current grade.

36.   On April 8, 2015, the CG, II MEF, negatively endorsed plaintiff's retirement request and recommended that the BOI not be held in abeyance.

37.   Plaintiff's request for retirement was not forwarded through the chain of command for consideration by the Separation Authority ("SA"), the Assistant Secretary of the Navy (Manpower & Reserve Affairs) ("ASN (M&RA)").

38.   Pursuant to law and governing Naval regulation, SECNAVINST 1920.6C, Enclosure (4), ¶ 12a(1) thru 12a(3), the Commanding General, II MEF is not an authorized denial authority for a

request for voluntary retirement, only the Deputy Commandant for Manpower and Reserve Affairs possessed denial authority

39.     The BOI was conducted on May 5, 2015 and the members found by a preponderance of the evidence that plaintiff (a) failed to demonstrate acceptable qualities of leadership required of an officer of his grade, (b) failed to properly discharge duties expected of officers of his grade and experience, and (c) committed a military offense punishable by confinement of six months or more and any other misconduct which would require specific intent for conviction.

40.     The Board rejected the allegation that plaintiff engaged in sexual perversion.  Specifically, the board substantiated that plaintiff violated Article 133 (conduct unbecoming an officer and a gentleman) and Article 134 (adultery) of the Uniform Code of Military Justice.

41.     The BOI recommended that plaintiff be separated with an Other Than Honorable characterization of service.  There was no minority report as the BOI acted unanimously.

42.     Because plaintiff would be retirement-eligible within six months of the BOI, and was otherwise eligible for retirement under the Temporary Retirement Authority statute, the BOI recommended that plaintiff be retired in the grade of First Lieutenant if he became retirement-eligible while his case was still pending.

43.     On June 29, 2015, plaintiff acknowledged receipt of the Report of BOI, indicated his desire to submit matters in rebuttal, and in accordance with policy, requested an additional 20 days from the Alternate Show Cause Authority in which to submit matters.

44.   On June 30, 2015, the CG, II MEF,[1] granted plaintiff a *10-day* extension in which to submit matters.   The Alternate Show Cause Authority was never provided opportunity to consider plaintiff's request.

45.    As a result of the unauthorized assumption of denial authority by the CG, II MEF that is reserved solely for the Show Cause Authority or Alternate Show Cause Authority, plaintiff's ability to obtain assistance of his assigned counsel was impaired due to the limited time allotted and assigned counsel's Permanent Change of Station ("PCS") reassignment.  No substitute counsel was provided to plaintiff.

46.   Plaintiff submitted his rebuttal matters on July 13, 2015 in which plaintiff included a copy of his withheld March 12, 2015 retirement request as an enclosure or, alternatively, a service characterization upgrade.

47.   Plaintiff's submission documented his review of the laws and regulations governing the TERA Program, and included his assertion that his BOI should have been held in abeyance while his retirement request was processed.  Plaintiff also alleged legal errors regarding the BOI, and raised his diagnosed PTSD as a mitigating factor in his conduct.  Plaintiff requested that if discharged, his service should be characterized as Honorable.

48.   On July 21, 2015, the CG, II MEF, endorsed plaintiff's BOI rebuttal matters.  In the endorsement, the CG, II MEF, asserted that plaintiff was not eligible for the TERA Program and incorrectly claimed that the military medical providers who examined plaintiff's *records*, but not plaintiff, determined that plaintiff was not diagnosed with PTSD or traumatic brain injury ("TBI").

---

[1] The Show Cause Authority is the approval/denial authority for such requests.  CG, II MEF was not the Show Cause Authority and lacked authority to deny plaintiff's request.

49.    The CG, II MEF, concurred in the BOI's recommendations that plaintiff be separated, that he receive an Other Than Honorable service characterization, and that, if eligible, plaintiff be retired in the grade of First Lieutenant.

50.    On July 21, 2015, plaintiff submitted supplemental BOI rebuttal matters to the ASN (M&RA) in which he correctly asserted that his retirement request was improperly withheld from submission to the SA, that his BOI was improperly not held in abeyance pending action on his retirement request, and that he was eligible to retire early under the TERA program.

51.    On May 14, 2015, after the BOI, the Division Surgeon, 2d Marine Division, who is not assigned to examine or treat Marines, but rather is a staff officer to the Commanding General 2d Marine Division who does not directly report to the CG, II MEF, examined plaintiff's medical records and found no diagnosis of PTSD or TBI.

52.    The Division Surgeon without examination of plaintiff and without apparent review of LT A.L.O.'s medical note opined that PTSD and TBI had no impact on plaintiff's misconduct.

53.    On May 11, 2015 and July 13, 2015, the Group Surgeon, II MEF Headquarters Group, interviewed plaintiff and screened his medical records for PTSD and TBI.  These matters included letters from plaintiff's civilian psychologist and a separate civilian therapist regarding his PTSD and its effect, in their opinions, on his misconduct.

54.    The CG, II MEF's endorsement conflicts with the screening conducted by the Group Surgeon, II MEF Headquarters Group, regarding whether plaintiff was diagnosed with PTSD.

55.    While the CG, II MEF asserted plaintiff had never been diagnosed with PTSD, the Group Surgeon concluded otherwise.  Following the second screening, the Group Surgeon noted that plaintiff's PTSD diagnosis was documented in his medical record on June 17, 2015.

56.    Without clinical evaluation by an appropriately credentialed provider, the Group Surgeon opined that plaintiff's PTSD was not a factor contributing to his misconduct, contrary to the previous treating clinicians.

57.    On September 8, 2015, the Deputy Commandant (Manpower & Reserve Affairs) recommended that plaintiff's request for retirement be denied and that plaintiff be separated with an Other Than Honorable characterization of service.

58.    Due to concerns by the office of the ASN (M&RA) regarding the conflicting PTSD assessments between military staff non-treating clinicians and plaintiff's civilian providers and the fact that the II MEF Headquarters Group Surgeon did not have a background in psychology or psychiatry, a new PTSD/TBI assessment was ordered.

59.    On September 23, 2015, the *2d Marine Division Psychiatrist* (a staff member on the General's staff whose billet does not call for clinical examination of military personnel for discharge) examined plaintiff's medical records and met with plaintiff for a 10-minute personal interview and then **falsely** endorsed a negative diagnosis of PTSD/TBI by a military-affiliated medical provider in the medical records he considered.  None of the plaintiff's military-affiliated providers' assessments based on clinical evaluation were provided to the Acting ASN (M&RA).

60.   Pursuant to federal law, 10 U.S.C. § 1177 (requiring specific medical evaluation to assess whether the effects of PTSD or TBI constitute matters in extenuation that relate to the basis for administrative

separation) mandates an evaluation that "must be reviewed and specifically addressed *by the chain of command* and Alternate Show Cause Authority as to any medical condition affecting (or not affecting) the basis for separation."), and the provisions of the Marine Corps Manual for Legal Administration, an officer with more than 180 days of active service requires a medical evaluation prior to separation.

61.   The medical evaluation must be completed by "appropriately privileged medical providers authorized to perform separation evaluations and shall be sufficient in scope and timing to meet separation physical requirements."

62.   The requirement is to show thoroughness and assure that Show Cause authorities and separation authority have "*all pertinent information* about any medical condition(s) that may have material impact on a Marine's behavior, including Post-traumatic Stress Disorder (PTSD) or Traumatic Brain Injury (TBI)."

63.   The minimum requirements for a separation evaluation are:  1) the Marine's completion of DD Form 2807-1 (Report of Medical History), 2) an interview and completion of DD form 2808 by an *appropriately* privileged medical provider, and 3) the medical provider's completion and signature on these and any other required documents. Marine Corps Order ("MCO") P5800.16A, Ch 7 dtd 10 Feb 2014, ¶ 4002.2(b)(1).

64.   The Commanding Officer, each General Court Martial Convening Authority in the chain of command and the Alternate Show Cause Authority are each required "to review this report and any post-deployment health assessments for consideration of any medical issues affecting separation." *Id.*

65.   E-mails later received by plaintiff pursuant to the Privacy Act and Freedom of Information Act ("FOIA") demonstrate that his command's focus was not on compliance with regulation and

assurance of plaintiff's mental status or even plaintiff's physical and mental well-being and treatment if required, but solely cutting every possible corner in order to have plaintiff's administrative discharge executed in order **that he not qualify for 20 year military retirement**.

66.    On September 29, 2015, the Acting ASN (M&RA) approved the recommendation and directed that plaintiff be separated with an Other Than Honorable characterization of service.

67.    Plaintiff was discharged on October 9, 2015 with 19 years, 11 months and 17 days of active-duty service.

*The Board for Correction of Naval Records*

68.    Throughout the BCNR decision memorandum, the Board (consisting of three members and no medical officers) rely upon the statements of command staff members who were supporting the decision of the II MEF Commanding General, such as the subordinate level Commanding General's Staff Psychiatrist and CG's Surgeon, each who lacked the duty position and proper unbiased character to perform a separation examination.

69.    The BCNR erroneously concluded that a presumption of fitness found in the regulation could not be overcome by evidence, the clinician's testimony and medical records had plaintiff been provided a hearing, which is required under the DES.

70.    The BCNR completely ignored the medical records from plaintiff's treating clinician, [TW] and relied upon General staff members who did not regularly or even remotely sometimes perform clinical duties.

71.    The BCNR failed to properly address the meaning and effect of a dismissal "with prejudice" of criminal proceedings and ignored the specific issues raised by plaintiff by his Application and

the court cases cited therein concerning the meaning and effect of "dismissal with prejudice" of criminal proceedings.

## COUNT I

### *(The Commanding General Failed to Comply with the PTA)*

72.     Plaintiff and the Convening Authority negotiated a PTA to resolve all of the claims set forth in the court-martial charging document.

73.     In a typical pretrial agreement**,** the accused foregoes certain "constitutional rights . . . in exchange for a reduction in sentence or other benefit. As a result, when interpreting pretrial agreements**,** contract principles are outweighed by the Constitution's Due Process Clause protections for an accused.

74.     In a criminal context the government is bound to keep its constitutional promises.

75.     In plaintiff's case, he gave up his legal and regulatory right to a trial by members, the right to plead not guilty, the right to confront and cross-examine witnesses, the right to remain silent at NJP and the right to the protection of the two-year statute of limitations for NJP, which otherwise would have barred punishment by NJP.

76.     The sole provision propounded by plaintiff in return for his waiver of his Constitution rights was withdrawal and dismissal of all charges ripening into dismissal with prejudice at announcement of NJP punishment.

77.     The Convening Authority failed to comply with the PTA.  The Convening Authority acted arbitrarily, capriciously and contrary to law and regulation.  Accordingly, the NJP must be set aside.

## COUNT II

*(The Board Failed to Be Properly Staffed)*

78.   Plaintiff requested review of his retirement and separation without pay for physical disability.  Plaintiff requested to be heard in person on the DD-149.

79.   The Secretary failed to establish a board of review consisting of five commissioned officers, two of whom shall be selected from the Army Medical Corps, officers of the Navy Medical Corps, Air Force Officers designated as medical officers or officers of the Public Health Service, to review upon the request of the former member released from active-duty without pay or finding of physical disability.

80.   Plaintiff applied for examination of his physical disability and no pay status within the 15 year statute of limitation.

81.   Plaintiff was denied the review which the Secretary is required to send to the President of the United States for review and approval.

82.   Defendant acted arbitrarily, capriciously and contrary to law and regulation in failing to provide plaintiff with a properly organized board and the opportunity to present evidence and witness testimony at the Board hearing before the 5 member panel including at least two medical officers.

## COUNT III

*(Post-BOI Hearing Processing Violated Plaintiff's Right to Effective Assistance of Counsel and is Ability to Marshal his Proof of PTSD and TBI With Counsel)*

83.    Following plaintiff's BOI, and due to the fact that his assigned military counsel was in the process of a PCS move, plaintiff requested an additional 20 days in which to submit post-BOI matters to the Alternate Show Cause Authority.

84.    As provided in regulation, plaintiff directed his request through the chain of command to the Alternate Show Cause Authority in his case.  Plaintiff's request was not forwarded to the Alternate Show Cause Authority who directed the BOI as is required by regulation, but was instead denied by the Staff Judge Advocate to the CG, II MEF.   (Enclosure (31)).[2]  LEGADMINMAN ¶ 4007.2.h(4).

85.    Pursuant to the provisions of 10 U.S.C. § 1177 and the Marine Corps Manual for Legal Administration, an officer with more than 180 days of active service requires a medical evaluation prior to separation.  *See* MCO P5800.16A, Ch 7 dtd 10 Feb 2014, ¶ 4002.2(b); *see also* 10 U.S.C. § 1177 (requiring specific medical evaluation to assess whether the effects of PTSD or TBI constitute matters in extenuation that relate to the basis for administrative separation).

86.    Such evaluation "must be reviewed and specifically addressed *by the chain of command* and Alternate Show Cause Authority as to any medical condition affecting (or not affecting) the basis for separation."  *Id.* (emphasis supplied).

87.    Further, the medical evaluation must be completed by "appropriately privileged medical providers authorized to perform separation evaluations and shall be sufficient in scope and timing to meet separation physical requirements."  *Id.*

---

[2] Colonel Riggs, the SJA had previously served as the legal advisor to the BOI in violation of LEGADMINMAN, ¶ 4007.2.e(2)(a) and as the legal advisor to the BOI should have been disqualified as the SJA providing advice to the General Court Martial Convening Authority.

88.    The requirement is to demonstrate thoroughness and is to assure that Show Cause authorities and separation authority have "*all pertinent information* about any medical condition(s) that may have material impact on a Marine's behavior, including Post-traumatic Stress Disorder (PTSD) or Traumatic Brain Injury (TBI)." *Id.* (emphasis supplied).

89.    The minimum requirements for a separation evaluation are:  1) the Marine's completion of DD Form 2807-1 (Report of Medical History), 2) and interview and completion of DD form 2808 by an appropriately privileged medical provider, and 3) the medical provider's completion and signature on these and any other required documents. MCO P5800.16A, Ch 7 dtd 10 Feb 2014, ¶ 4002.2(b)(1).

90.    The Commanding Officer, each General Court Martial Convening Authority in the chain of command and the Alternate Show Cause Authority are each required "to review this report and any post-deployment health assessments for consideration of any medical issues affecting separation." *Id.*

91.    In plaintiff's case, none of the required procedures were complied with.  An e-mail chain between the Office of the Assistant Secretary of the Navy and the Office of the Staff Judge Advocate ("SJA"), II MEF, establish that the required medical evaluation was neither properly conducted, nor was it submitted through the chain of command, including the Alternate Show Cause Authority, prior to plaintiff's administrative separation.

92.     The e-mails establish that the command was trying to "win the race" to separate plaintiff prior to reaching 20 years active-duty service rather than providing a proper medical evaluation for the consideration of reviewing authorities prior to discharge.

93.    On September 25, 2015, in response to a specific request for further information on plaintiff's PTSD from the ASN (M&RA), plaintiff was ordered to meet with a Navy Psychiatrist (CDR C).

94.    CDR C knew that plaintiff was being treated by a military-affiliated civilian psychiatrist, however, no effort was made to contact plaintiff's treating psychiatrist (he was "unavailable", according to e-mail).  After a10-minute meeting, and without consulting with any of plaintiff's s mental health providers, CDR C concluded that there was no "military affiliated diagnosis of PTSD."[3]

95.    Significantly, the letter issued by CDR C referenced the Marine Corps Separation and Retirement Manual, citing an enlisted-only reference, paragraph 6110.3(g).  Moreover, although this letter was apparently submitted directly to the office of the Assistant Secretary of the Navy, it was not forwarded through the chain of command for consideration by the chain of command, as required by regulation, and was not included in plaintiff's Official Military Personnel File ("OMPF") or Medical Record.

96.    In an e-mail dated 1 October 2015 (8:01 PM) was redacted of all information except the author's name, the same e-mail was produced in its entirety and it is a devastating indictment of the fairness of the process in Petitioner's case.  Whereas Petitioner was officially evaluated as "fit for full duty," the unredacted 8:01 PM e-mail suggests otherwise.  The author of the email wrote: "My gut tells me he is a coward.  *However, psychologists don't throw terms like sociopath around loosely.*"  (emphasis supplied). The author of the e-mail also "asked the SJA to pursue a *Persona*

_____

[3] This statement was unequivocally false – as reflected in the provider notes on Chronological Records of Medical Care dated 7 July 2015, 27 July 2015, 11 August 2015, 26 August 2015, 14 September 2015 and 5 October 2015 where the "working diagnosis" was PTSD and never changed.  Had the actual provider been consulted, this information would have been available to provide to the Acting Assistant Secretary of the Navy.

*Non Grata* letter with Base upon separation." This unredacted e-mail chain demonstrates that the evaluation provided officially to the Acting Assistant Secretary of Navy was different than what the psychologists were reporting to the command, but which went unreported to the Assistant Secretary of Navy prior to plaintiff's separation.

97.    A SECNAV policy dated 1 Jun 2016 recognized that Naval personnel were being discharged without proper medical evaluation and DES screening, as in this case. The policy provides that medical diagnosis will from that date forward outweigh conduct, unless the conduct is considered too egregious.

98.    The policy also requires that the Naval Discharge Review Board and Board for Correction of Naval Records ("BCNR") consider the policy when evaluating Applications for discharge and military records correction relief.   It is clear that the BCNR did not apply these standards; rather the BCNR focused on supporting the command decision.

99.    The BCNR ignored these significant procedural failures and failed to address the e-mails.

100.   The post-BOI processing and the BCNR consideration of plaintiff's case was arbitrary, capricious and contrary to law and regulation and the BOI should be set aside.

## COUNT IV

*The CG II MEF Committed Legal Prejudicial Error By Failing to Forward  Plaintiff's Voluntary Request for Retirement Submitted on 12 Mar 15,a Time When No UCMJ Actions Were Then-Pending Against Petitioner.*

101.   On March 12, 2015, plaintiff submitted to the chain of command a request for voluntary retirement. The request fully complied with the provisions of SECNAVINST 1920.6C, Enclosure (4).

102.    On March 12, 2015, the Commander Marine Corps Forces Command, the alternate Show

Cause Authority issued a letter requiring Petitioner to Show Cause for retention in the Marine

Corps.   The Show Cause Notification included the provision providing notification that Petitioner

may be retired in the highest grade in which he served satisfactorily.

> 10 U.S.C. § 1186 (a) provides:
>
>> At any time during proceedings under this chapter with respect to the removal of an officer from active duty, the Secretary of the military department concerned may grant a request by the officer— (1) for voluntary retirement, if the officer is qualified for retirement."

103.    As provided in SECNAVINST 1920.6C, Enclosure (4), ¶ 12a:

> Officers (Regular or Reserve, temporary or Permanent) who are being considered for removal from active duty per this instruction and who are eligible for voluntary retirement *under any provision of law* on the date of such removal, may, upon approval of SECNAV, be retired in the highest grade in which they served satisfactorily as determined by SECNAV. . . .

104.    The regulation requires that such requests be addressed to SECNAV via the Deputy

Commandant (M&RA) who is the only authority in the Marine Corps below the SECNAV (or his

designee) who may disapprove such a request only when actions against the officer under the

UCMJ are pending.  SECNAVINST 1920.6C, Enclosure (4), ¶ 12a(1) thru 12a(2).

105.    Petitioner requested copies of all endorsements to his voluntary retirement request.  The II

MEF SJA Chief responded to plaintiff by e-mail dated 11 Sep 15 and stated that the retirement

request was never endorsed nor forwarded by MARFORCOM, and therefore was never submitted

to Headquarters Marine Corps for consideration by the Deputy Commandant (M&RA) and the

Separation Authority – SECNAV or his designee.   According to the regulation:

> The request **shall be forwarded** with appropriate command endorsements.  Each endorsement shall include a recommendation to approve or disapprove the request and a statement indicating the highest grade in which the officer served satisfactorily.

SECNAVINST 1920.6C, Enclosure (6), ¶ 2c. (emphasis supplied).

106. The failure to forward the voluntary retirement request constituted legal error which materially prejudiced plaintiff because the Deputy Commandant and SECNAV were never provided the opportunity to decide whether plaintiff's offer to save the time and effort (as well as the time of the officers assigned at the BOI) of a BOI process.

107. On September 18, 2012, in compliance with the National Defense Appropriations Act of 2012, the Assistant Secretary of the Navy (Manpower & Reserve Affairs) promulgated a memorandum delegating authority to the Deputy Commandant (M&RA) to establish and manage an early retirement program ("TERA") for the Marine Corps.

108. This delegation of authority was to extend through December 31, 2018 and required the Deputy Commandant to "administer this early retirement program *in strict accordance* with Section 4403 of the National Defense Authorization Act (NDAA) for FY 1993 (P.L. 102-484) as amended by Section 504 of the NDAA for FY 2012 (P.L. 112-81)." ASN (M&RA) memo dtd 18 Sep 12 (Enclosure (30)) (emphasis supplied).

109. On the date plaintiff submitted his request for voluntary retirement, March 12, 2015, under either 20 year retirement, or under TERA, he was not then pending any disciplinary action and was not pending an administrative discharge, which would be permissible only after a Show Cause Board of Inquiry was held and until the ASN (M&RA) approved such discharge, on or after 29 September 29, 2015, and was within SECNAV's plenary authority to retain an officer even after the Deputy Commandant recommends separation. SECNAVINST 1920.6C, Enclosure (4), ¶ 12.

110. Underscoring that the Marine Corps failed to comply with the letter of the law and that plaintiff was then-entitled to apply for TERA, which request should have been submitted through

22

the chain of command to the disapproval authority, the D/C (M & RA), the Marine Corps

promulgated MARADMIN 270/15 for fiscal year 2016, which demonstrates plaintiff's potential

entitlement if approved by the Secretary:

> OFFICERS RETAINED ON ACTIVE DUTY FOLLOWING COMPLETION OF
> LEGAL, ADMINISTRATIVE OR DISABILITY SEPARATION PROCESSING
> MAY APPLY FOR TERA IF OTHERWISE ELIGIBLE. OFFICERS WHOSE
> SEPARATION IS DIRECTED BY COMPETENT AUTHORITY, AS A RESULT OF
> LEGAL OR ADMINISTRATIVE PROCESSING, ARE NOT ELIGIBLE.

111.    By suppressing and failing to forward plaintiff's request for voluntary retirement in

accordance with law and regulation, plaintiff was denied the right to have his case for retirement

timely considered by the Secretary of the Navy, or his designee.

112.    By the actions of the Commanding General who was not involved in the TERA

denial/approval process, defendant acted arbitrarily, capriciously and contrary to law and

regulation denying plaintiff an opportunity to have the Secretary consider plaintiff's case for

retirement prior to the BOI and the time and manpower would be required.

## PRAYER FOR RELIEF

Based upon the foregoing and the Administrative Record plaintiff requests that the Court

remand the case to the Secretary requiring that the Secretary of the Navy:

> Set aside plaintiff's BOI due to material legal errors;
>
> Direct the Secretary to conduct a proper Review Board pursuant to 10 U.S.C. §1554;
>
> Set aside plaintiff's NJP and remove and expunge all related documents for failure to
> comply with the specifically negotiated provision requiring dismissal of court-martial
> charges with prejudice;
>
> Expunge and remove all documents from plaintiff's OMPF, Performance File, and the
> ODNS referring or relating to plaintiff's involuntary administrative separation,
> including all documents relating to or referring to the Board of Inquiry, including but

not limited to the BOI Report, the transcript thereof, all endorsements thereon, plaintiff's rebuttals materials and any other similar documents;

Order such additional relief as may be required to afford plaintiff thorough and fitting relief as required by statute and caselaw.

Respectfully submitted,


s/Charles W. Gittins
(D.C. Bar  #439710)

P.O. Box 144
Middletown, VA 22645
(540) 327-2208
E-mail:  cgittins@aol.com


*Attorney for Robert Carlborg*

Dated:  October 8, 2021